[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15259

_____

D.C. Docket No. 3:17-cr-00074-RV-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SANFORD EUGENE JOHNSON, III,
a.k.a. Bubba,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(November 19, 2020)

Before MARCUS, JULIE CARNES, and KELLY,* Circuit Judges.

JULIE CARNES, Circuit Judge:

Defendant Sanford Eugene Johnson, III, directed the ordering, pickup, distribution and sale of large quantities of marijuana in northwest Florida. Following an investigation that ensnared fellow participants in the same criminal enterprise, Defendant was charged and pled guilty to two counts: (1) conspiracy to distribute and possess with intent to distribute more than 100 kilograms of marijuana and (2) conspiracy to commit money laundering. The district court sentenced Defendant to two concurrent 151-month sentences.

Defendant appeals his sentence. He argues the district court erred by holding him responsible for more than 400 kg of marijuana, enhancing his sentence for obstruction of justice and criminal livelihood, failing to give him full credit for his timely acceptance of responsibility, and imposing a substantively unreasonable sentence of 151 months when his co-conspirators received lesser sentences. After careful review, and with the benefit of oral argument, we affirm.

---

* Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, sitting by designation.

## I.    BACKGROUND

### A.    The Marijuana Distribution Conspiracy

Defendant and seven other codefendants participated in a conspiracy to distribute marijuana from about January 1, 2014 until about May 22, 2017.  Each codefendant also conspired to launder money from the sale of marijuana through various bank accounts.

The conspiracy centered on Charles Sindylek, a former Pensacola, Florida, resident who moved to California.  Sindylek coordinated the receipt of orders from buyers in Florida, ordered marijuana from a California supplier, Brandon Remeyer, and provided payment instructions to the buyers.  Remeyer would package the marijuana in other items, like dog beds, and ship the package via UPS and Fed Ex to various addresses in Florida as directed by the buyers.  The Florida buyers, including Defendant, picked up the packages or had others do it for them.  They sold the marijuana in the local community to dealers or users, deposited the proceeds in accounts accessible to Sindylek and Remeyer, and took a cut for themselves.  Before being apprehended, the conspirators deposited over $3,500,000 in cash proceeds from the sale of marijuana.

### B.    Procedural History

In July 2017, a federal grand jury indicted Defendant along with Sindylek, Remeyer, and five other defendants:  David DelGiacco, Andrew Marcelonis, Brett Brownell, William Brownell, and Steven Sholly.  The indictment charged all

3

defendants with conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count 1), and all defendants except Sholly with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (h) (Count 2).  Count 1 of the indictment alleged that the quantity of marijuana attributable to Defendant was 100 kilograms or more, in violation of 21 U.S.C. § 841(b)(1)(B)(vii).  Defendant eventually pled guilty to both counts, but not before engaging in conduct ultimately deemed obstructive.

### 1.     Defendant's Violation of a Protective Order

Though he eventually accepted responsibility for his actions, Defendant became angry when he first learned that some of his fellow conspirators had cooperated with authorities investigating the criminal enterprise.  He expressed that anger to agents who executed a search warrant on Defendant's residence in March 2017, stating, "When I get discovery and find out who snitched on me, I'm going to bash their heads in."

After indicting Defendant, the Government moved for a protective order to limit the dissemination of discovery materials that Defendant might use to retaliate against cooperating witnesses.  The Government explained in its motion:

> Based upon the nature of the charges and the drug trafficking organization with which the defendants are alleged to be associated, the government's discovery materials include reports involving the debriefings of potential cooperating witnesses adverse to the

defendants.    This includes those who the defendants, or others who remain at large, would have reason to harm in retaliation for cooperation with the government.   Given the totality of circumstances underlying this indictment, the government contends it would be inappropriate for the defendants to receive a physical copy of discovery to keep in their possession.

The district court granted the motion and issued a protective order prohibiting Defendant and his counsel from:  (1) using discovery material for any purpose other than defense of the case; (2) disclosing discovery material directly or indirectly to any other person; or (3) copying or reproducing discovery materials. The protective order also required defense counsel to redact identifying information of cooperating witnesses from discovery materials provided to Defendant.

Defendant violated the protective order, photographing discovery materials of two reports of interviews with Brett Brownell and sending them via Facebook Messenger to a potential witness, Lauren Gibbs.  Gibbs had made multiple cash deposits of drug proceeds.  Defendant and Gibbs exchanged the following messages:

**Defendant**: I have allllll the paper work

Brett [Brownell] snitched on all of us

...

Zack [Sindylek] did go in. Yes Everyone except me did

...

He's [Brett's] not the only one who told. So far, with the paper work I've seen 4 snitches

**Gibbs**: Brett's Mom said his lawyer told her there were numerous criminal informants telling on y'all before your door ever got kicked in

Those are the snitches you need to be looking for

Brett did what anyone else would do in his situation

He was told that everyone was making him out to be the main guy

**Defendant**: Well I can't talk for everyone else. But I know that for a fact [his]name never came out of [my] mouth.

But u can believe it will now

And when I see him he's mine

...

But he told on point blank.

...

Idgaf if he told on zack.

....

But I'm mad about me

As explained below, because Defendant violated the protective order and communicated with a potential witness, the district court concluded that he had obstructed justice and enhanced his sentencing guidelines range accordingly.

### 2.    Sentencing

#### a.    The Presentence Investigation Report

Following Defendant's guilty plea, a probation officer prepared a Presentence Investigation Report ("PSR"). The PSR adopted the facts contained in

the plea agreement and included additional information derived from investigators regarding Defendant's criminal activity.

The probation officer concluded that Defendant should be held responsible for 586.95 kilograms of marijuana based on the calculation that Defendant had received at least 174 packages containing at least 6 pounds of marijuana each (totaling 473.55 kilograms of marijuana bud) and an additional 5 pounds of wax made from butane hash oil ("BHO") (equivalent to 113.4 kilograms of marijuana). This calculation meant that Defendant should be held responsible for more than 400 but less than 700 kilograms of marijuana, which resulted in a Base Offense Level of 26 pursuant to U.S.S.G. § 2D1.1.

The probation officer concluded that Defendant had recruited, directed, supervised, and/or controlled a number of individuals who received marijuana packages for him and/or made bank deposits for him. Based on that information, the probation officer determined that Defendant played an aggravating role in the conspiracy and recommended a 4-level enhancement pursuant to U.S.S.G. § 3B1.1(a).

The PSR added two levels to Defendant's Base Offense Level pursuant to U.S.S.G. § 2D1.1(b)(15)(E) (2016)[1] because Defendant committed the offense as

---

[1] The Commission amended Section 2D1.1 effective November 1, 2018. This provision now appears at U.S.S.G. § 2D1.1(b)(16)(E).

part of a pattern of criminal conduct engaged in as a livelihood. An additional two levels were added pursuant to U.S.S.G. § 2S1.1(b)(2)(B) because Defendant was convicted of laundering under 18 U.S.C. § 1956. Finally, two levels were added to account for Defendant's obstruction of justice pursuant to U.S.S.G. § 3C1.1. The above calculations resulted in a Total Offense Level of 36.

Despite Defendant's guilty plea and admission to being involved in the charged offense, the PSR included no reduction for acceptance of responsibility. Explaining this omission, the PSR cited Application Note 4 to U.S.S.G. § 3E1.1, which states that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." Accordingly, no reduction was awarded to Defendant.

With nine criminal history points, plus two more added because Defendant committed the charged offense while under another criminal justice sentence, Defendant's Criminal History Category was V. His guideline imprisonment range was 292-365 months.

Johnson filed objections to the PSR. Relevant to this appeal, he objected to the calculation of drug weight, the two-level enhancement for criminal livelihood, the two-level enhancement for obstruction of justice, and the decision to deny him a reduction for acceptance of responsibility. He also argued that his criminal

8

history category of V over-represented the seriousness of his prior criminal offense.

b.     Evidence at the Sentencing Hearing

The district court conducted a sentencing hearing during which two Government witnesses, DEA Special Agent Benjamin Murphy and IRS Special Agent Christopher Pekerol, testified.  Special Agent Murphy testified regarding the nature and scope of Defendant's marijuana distribution operation, as determined through his interviews with Defendant and those employed by Defendant to pick up and distribute marijuana.  He testified that Defendant admitted his participation in the drug operation from January or February of 2015 onward.  He further testified that Defendant stated he:  (1) paid several people to receive deliveries of marijuana packages and make cash deposits into bank accounts on his behalf; (2) made $100 per pound of marijuana received from the California suppliers; and (3) he made between $600 to $1,200 per week from his operation.  Special Agent Murphy also testified that interviews with those employed by Defendant confirmed the nature and scope of Defendant's drug operation, including that Defendant received about a pound of BHO once or twice a month.

Special Agent Pekerol testified about Sindylek's statements concerning Defendant's involvement in the conspiracy.  He testified that Sindylek informed him that Defendant received approximately two boxes of marijuana per week and

that each box contained between 6 and 8 pounds, but almost always 8 pounds. In addition to those shipments, Special Agent Pekerol relayed that Sindylek stated that Defendant received five shipments of BHO, which were almost always one pound per box.

Special Agent Pekerol further described his own independent investigation of the quantity of marijuana bud attributable to Defendant. He explained that his analysis of FedEx and UPS shipping records established that Defendant was responsible for 174 shipments of marijuana. Special Agent Pekerol conservatively estimated that Defendant was responsible for 1,044 pounds of marijuana bud. He testified that this figure was conservative because it excluded shipments to Defendant's personal residence[2] and was based on each package containing only six pounds of marijuana, which was the low end of the range that witnesses, including Sindylek, had stated were typically shipped in each package. Accordingly, he estimated Defendant was responsible for 1,044 pounds, or 473.5 kg, of marijuana bud.

Addressing the criminal livelihood enhancement, Special Agent Pekerol also testified that, while Defendant made approximately $104,400 from marijuana bud

---

[2]  Defendant had previously objected to the PSR noting that "[m]ost of the packages sent to Johnson's address contained 1 pound of marijuana which Johnson used for his personal use." However, Special Agent Pekerol excluded packages sent to Defendant's personal residence when determining that Defendant was responsible for 174 shipments of marijuana.

10

sales (not including any money made from distribution of BHO) over an approximately two-year period, Defendant's tax returns and bank statements showed little evidence of regular employment wages or a source of legitimate income during that time.

Addressing the obstruction of justice enhancement, Special Agent Pekerol explained the nature and scope of Defendant's breach of the protective order. He further recounted Defendant's messages to Gibbs, including the "he's mine" statement that could be perceived as a threat to Brownell.

c.     The District Court's Rulings on Defendant's Objections

The district court overruled Defendant's objection to the drug quantity calculation, noting that the weight estimate was "a conservative amount" and that, even without considering the more than 100 kg of marijuana in the BHO shipments, Defendant was responsible for 473.55 kg, which is over the 400-kilogram threshold for Offense Level 26. The court likewise overruled Defendant's objection to enhancements for criminal livelihood and obstruction of justice.

As to the four-level enhancement for being a leader, Defendant argued that others were more involved and at an earlier time than him. The district court sustained the objection, in part, and deemed a two-level enhancement appropriate given Defendant's supervisory role in this "midlevel-distribution ring."

11

The district court also sustained Defendant's objection to not receiving a two-level reduction for acceptance of responsibility based on his guilty plea, which plea had occurred after his obstructive conduct. The court expressed an inclination to give the additional one-level reduction available to defendants who timely plead guilty, but indicated its inability to do so, given that U.S.S.G. § 3E1.1(b) requires the Government to move for the reduction and the Government had declined to make this motion based on Defendant's obstructive conduct. Defendant did not challenge the Government's power to withhold the motion. After all enhancements and reductions were counted, Defendant's total offense level was 32.

Defendant objected that his Criminal History Category overrepresented his criminal history. The district court agreed. The court therefore decreased Defendant's Criminal History Category from V to III, reducing his guideline imprisonment range to a 151–188 month range. The court sentenced Defendant to a term of 151 months on each of Counts One and Two, with the terms to run concurrently.

## II.    DISCUSSION

In this appeal, Defendant raises five challenges to his sentence: the three enhancements based on the quantity of marijuana, obstruction of justice, and criminal livelihood; the district court's failure to award an additional one-level

reduction for acceptance of responsibility; and the substantive unreasonableness of his sentence.

### A.     The District Court Did Not Clearly Err in Finding Defendant Responsible for More Than 400 Kilograms of Marijuana

The district court found Defendant responsible for more than 400 kilograms of marijuana based on the testimony of Special Agents Murphy and Pekerol regarding the number of marijuana packages shipped to Defendant and the approximate quantity of marijuana contained in each package.  Defendant maintains the evidence was insufficient to hold him responsible for more than 400kg of marijuana, which is the threshold required to apply a base offense level of 26 under U.S.S.G. § 2D1.1(c)(7).  We review a district court's determination of the quantity of drugs attributable to a defendant for clear error.  *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012).

As an initial matter, Defendant concedes that the documentary evidence supports holding him accountable for 174 shipments of marijuana from California to addresses he controlled in Florida.  Thus, this case is not like *United States v. Sholly*, 785 F. App'x 714, 719 (11th Cir. 2019), where we vacated the sentence of Defendant's co-conspirator, Steven Sholly.  In its non-precedential opinion, the *Sholly* panel explained that it could find no apparent support in the record for the reliability of the hearsay statement establishing the number of shipments to Sholly,

nor any hint from the sentencing court or the prosecutor as to why the information was reliable.

In particular, the Government had failed to provide shipment records to corroborate hearsay statements made by Sindylek regarding the number of packages shipped to Sholly. *Id.* That is not the case here. And as noted, Defendant does not contest the number of shipments, which fact is clearly established by the documentary evidence in this case. Instead, he challenges the amount of marijuana shipped in each package. He argues that the evidence is insufficient to hold him accountable for more than 400 kg of marijuana because the Government "relied *solely* on Sindylek's hearsay statements to find that each package contained six pounds of marijuana and that [he] received five pounds of BHO." (emphasis added by Defendant). Defendant maintains this hearsay evidence is not reliable because "the court did not have the opportunity to make its own credibility determinations as to the veracity of Sindylek's statements, nor did the government give the court any corroborating evidence to rely upon." Thus, Defendant contends the Government did not carry its burden of establishing drug weight by a preponderance of the evidence. *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005).

We find no error in the district court's assessment of the evidence and determination that Defendant should be held accountable for more than 400 kg of

14

marijuana. As an initial matter, Defendant's own admissions corroborate Sindylek's hearsay statements that Defendant typically received six to eight pounds in each marijuana package. Defendant stated his cut was $100 per pound and he was making $600 to $1200 per week. Thus, Defendant admits to distributing six to 12 pounds of marijuana each week. Moreover, that Defendant estimated he was making $600 to $1200 per week is consistent with him averaging receipt of one to two shipments a week, each containing six pounds. That too is consistent with the shipping records showing 174 shipments over an approximately 112-week period.[3] Accordingly, the drug quantity approximation used by the district court is well within Defendant's own estimated range.

To the extent the district court may have also considered the hearsay statements of Sindylek that Defendant received 6 to 8 pounds per shipment, we find no error there. Hearsay evidence can support a sentencing decision "provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3; *United States v. Baptiste*, 935 F.3d 1304, 1315 (11th Cir. 2019). Contrary to Defendant's arguments, our case authority does not require

---

[3] Defendant also stated his involvement in the conspiracy began in January or February 2015 and lasted more than two years. Even assuming that Defendant ceased operations at the end of March 2017 when authorities executed a search warrant at his house, Defendant trafficked in marijuana for at least 112 weeks (between January/February 2015 and March 2017). That equates to 672 pounds (304.8 kg) to 1344 pounds (609.6 kg) of marijuana, not including shipments of BHO.

express findings that hearsay evidence is reliable before it can be considered in sentencing. *Baptiste*, 935 F.3d at 1315 (rejecting argument that *United States v. Lee*, 68 F.3d 1267 (11th Cir. 1995) requires an express finding that hearsay evidence is reliable).

Here, the record sufficiently indicates the reliability of Sindylek's statements concerning the quantity of marijuana contained in each package sent to Defendant. As noted, Defendant's own admissions are consistent with Sindylek's 6 to 8-pound estimate and establish the reliability of that hearsay testimony.[4] Those statements also strongly suggest that shipments were in at least 6-pound increments given that Defendant was making $100 per pound and clearing $600 to $1200 per week, depending on whether he received one or two packages. Tellingly, there is no evidence suggesting that Defendant received less than 6 pounds per package. Nor does it appear that any such finding would be consistent with the documentary evidence concerning Defendant's drug transactions and the bank deposits reviewed by Agents Murphy and Pekerol.

Given the totality of the evidence, the district court did not clearly err in attributing 6 pounds of marijuana per shipment to Defendant and holding Defendant responsible for at least 1,044 pounds, or about 473.55 kilograms, of

---

[4]  Special Agent Pekerol also testified that he interviewed multiple codefendants and witnesses and "almost everyone said that the boxes contained about 8 pounds."

marijuana. The court was entitled to approximate the quantity of marijuana for which Defendant was responsible based on evidence "demonstrating the average frequency and amount of a defendant's drug sales over a given period of time." *Almedina*, 686 F.3d at 1315–16; *Rodriguez*, 398 F.3d at 1296 (citing *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996)); U.S.S.G. § 2D1.1 cmt. n.5 (Nov. 2016). And the district court applied the low end of the weight range of shipments to Defendant in estimating the quantity attributable to Defendant. *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir. 1998) (sentencing "may be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to a defendant").

Accordingly, we affirm the district court's finding that Defendant should be held accountable for more than 400 kg of marijuana.

## B.    The District Court Did Not Clearly Err in Applying a Two-Level Enhancement for Obstruction of Justice

The district court found Defendant obstructed justice because Defendant transmitted discovery to Gibbs in violation of the court's protective order, and threatened a co-conspirator, Brett Brownell, when he stated, "And when I see him, he's mine." "Whether the district court properly applied the obstruction of justice enhancement is a mixed question of law and fact." *United States v. Bradford*, 277 F.3d 1311, 1315 (11th Cir. 2002) (quotation marks omitted). "This Court reviews

17

a district court's factual findings for clear error and their application of the

Guidelines to those facts *de novo*. *Id*.

The district court did not clearly err in applying a two-level enhancement for

obstruction of justice. The Sentencing Guidelines provide:

> If (1) the defendant willfully obstructed or impeded, or attempted to
> obstruct or impede, the administration of justice with respect to the
> investigation, prosecution, or sentencing of the instant offense of
> conviction, and (2) the obstructive conduct related to (A) the
> defendant's offense of conviction and any relevant conduct; or (B) a
> closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. Application Note 4(A) further provides as an example of

obstruction "threatening, intimidating, or otherwise unlawfully influencing a co-

defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id*. cmt.

n.4.

Here, the facts support a finding that Defendant unlawfully photographed

discovery materials, used the photographs to demonstrate to Gibbs, a potential

witness, that he had "allllll the paper work" regarding snitches, and threatened

harm to at least one snitch, Brownell, when he declared "he's mine." The message

to Gibbs was clear: Defendant would do bodily harm to those that testified against

him. Defendant's messages reflect an effort to threaten a co-defendant, Brownell,

and to intimidate a potential witness, Gibbs.

Defendant contends that transmitting discovery in violation of the court's

order and threatening a co-defendant snitch cannot support a finding of obstruction

18

because cases finding obstruction and the application notes to § 3C1.1 "all discuss providing false information to a judge or a law enforcement official in an attempt to hinder the investigation." Defendant asserts that "sharing of discovery by itself, with no evidence of ulterior motive regarding the impending case, is not obstruction of justice." Defendant further contends that his comments were not a threat, just "an expression of anger," that he "did not attempt for his statement to Ms. Gibbs to be transmitted to Brownell," and that he did not intend to affect the investigation or prosecution.

Defendant's arguments that the court clearly erred in finding his conduct to constitute obstruction of justice are not persuasive. First, the commentary provides a "<u>non-exhaustive</u> list of examples of the types of conduct to which [the obstruction] adjustment applies." U.S.S.G. § 3C1.1 cmt. n.4 (emphasis added). That Defendant's specific conduct is not listed is not dispositive. Second, Defendant's conduct in violating the protective order and using that information to threaten a cooperating witness was indeed obstructive. The district court entered a protective order to prevent Defendant from retaliating against cooperating witnesses, yet Defendant blatantly disobeyed the order, using this access to discovery materials to make credible his threat to harm snitches—an act that could have significantly undermined the investigation. That his threat was not communicated directly to Brownell is not dispositive. *See United States v. Taylor*,

19

88 F.3d 938, 943–44 (11th Cir. 1996) (enhancement appropriate where the record clearly reflects the basis for enhancement and supports it, even if defendant's attempt to obstruct does not actually succeed); *Bradford*, 277 F.3d at 1315 (threats need not be made directly to person to constitute obstruction).

Third, it was not unreasonable for the district court to view Defendant's statement "when I see him[,] he's mine" as a threat to Brownell, especially given Defendant's earlier expressed desire to "bash [snitches'] heads in." Moreover, Defendant both transmitted the discovery material in violation of the court's order and voiced his displeasure with cooperating witnesses to Gibbs, who, as a depositor of cash payments for marijuana sales, was herself a potential witness.

Finally, even if one could plausibly interpret Defendant's communication to Gibbs as merely "venting," and not representing an actual or attempted threat, the district court did not clearly err in finding obstruction so long as its interpretation was reasonable. "Where a fact pattern gives rise to two reasonable and different constructions, the factfinder's choice between them cannot be clearly erroneous." *Almedina*, 686 F.3d at 1315 (internal quotation omitted). And the district court's conclusion that Defendant's communication was an attempt to obstruct the investigation was clearly reasonable.

Accordingly, we affirm the district court's finding of obstruction of justice and application of a two-level enhancement under U.S.S.G. § 3C1.1.

20

**C.    The District Court Did Not Clearly Err in Applying a Two-Level Enhancement for Livelihood**

Defendant contends the district court erred in applying a two-level enhancement for livelihood.  A livelihood enhancement is appropriate when a defendant:  (1) receives an aggravating role adjustment under § 3B1.1; and (2) "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood."  U.S.S.G. § 2D1.1(b)(15)(E) (2016).  Defendant does not challenge the district court's application of an aggravating role adjustment and the first requirement is therefore satisfied.  We focus on determining whether the district court erred in finding that Defendant "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood."

Defendant argues only that the Government failed to present sufficient evidence that he "engaged in" the criminal conduct "as a livelihood."  "[E]ngaged in as a livelihood" as used in § 2D1.1(b)(15)(E) has the same meaning as in the criminal livelihood enhancement in § 4B1.3.  U.S.S.G. § 2D1.1 cmt. n.20(C).  The commentary to § 4B1.3 defines "engaged in as a livelihood" as:

> (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct).

21

U.S.S.G. § 4B1.3 cmt. n.2 (emphasis added).

The district court overruled Defendant's objection to the two-level increase in offense level for livelihood under Sections 2D1.1(b)(15)(E) and 4B1.3 because Defendant "was making a lot more money from selling marijuana than he was from any other employment in 2015 and 2016" and his income was clearly greater than minimum wage. The district court's factual findings are reviewed for clear error and its application of the facts to the Sentencing Guidelines is reviewed *de novo*. *United States v. Dougherty*, 754 F.3d 1353, 1358 (11th Cir. 2014).

The district court did not clearly err in finding that Defendant's income from marijuana sales was greater than minimum wage and a lot more than his income from legitimate employment. The record supports that Defendant made more than $100,000 from marijuana sales over a two-year period, which far exceeds minimum wage.[5] Moreover, Defendant reported less than $10,000 of legitimate income for 2015 and 2016.

While Defendant claims unreported "under the table" income from working at Cameron Amore Painting , no direct evidence of how much Defendant earned under the table exists. Defendant alleges he worked at Cameron Amore Painting for six months at $12.00 to $15.00 per hour. Even if true, that amounts to only

---

[5]  The federal minimum wage in 2015 and 2016 was $7.25 per hour. *See* 29 U.S.C. § 206(a)(1)(C).

about $15,000, assuming the highest rate of compensation and a 40-hour work week. Accordingly, the district court did not clearly error in assessing the value of Defendant's marijuana income as being clearly greater than his legitimate employment income and the minimum wage.

We reject Defendant's reliance on Application Note 2 of U.S.S.G. § 4B1.3[6] for the proposition that merely having some legitimate employment precludes the livelihood enhancement because "the question is whether 'the defendant engaged in criminal conduct *rather* than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct.'" U.S.S.G. § 4B1.3 (emphasis added by Defendant). Application Note 2 provides that the court need only find that "criminal conduct was the defendant's primary occupation," not that it was his only occupation. U.S.S.G. § 4B1.3 cmt. n.2. The portion quoted by Defendant merely provides an example ("e.g.") of what can constitute livelihood. Moreover, because Defendant had large gaps in his legitimate employment history while participating in the conspiracy,[7] he did

---

[6] Defendant mistakenly cites U.S.S.G. § 4B1.2.

[7] Even if we were to accept Defendant's unsupported assertions that he had an under-the-table job with Cameron Amore Painting for approximately 6 months prior to his arrest, the record reflects that Defendant lacked legitimate employment for a majority of the time he participated in the conspiracy.

23

engage in criminal conduct "rather than <u>regular</u>, legitimate employment."[8]  *Id.* (emphasis added).

Because the record supports the conclusion that marijuana distribution was Defendant's primary occupation, and because he is attributed with deriving more than $14,500, or 2000 times the federal minimum wage, in income from the conspiracy for 2015 and 2016, the district court did not err in finding that Defendant engaged in marijuana distribution as his livelihood.  Accordingly, we affirm the district court's application of a two-level increase in Defendant's base offense level pursuant to U.S.S.G. § 2D1.1(b)(15)(E) (2016).

> **D.** **The District Court Did Not Plainly Err in Denying Defendant an Additional One-Level Reduction for Timely Acceptance of Responsibility**
>
> 1. <u>Plain Error Review Applies</u>

The impact of the district court's imposition of an enhancement based on Defendant's obstructive conduct bled over into the amount of credit he got for his acceptance of responsibility, as Defendant's obstruction prompted the Government not to file a motion asking that Defendant be given an additional one-level reduction for his timely acceptance of responsibility.  Defendant now contends that

---

[8]  The Background note supports this interpretation by stating that "Section §4B1.3 implements 28 U.S.C. § 994(i)(2), which directs the Commission to ensure that the guidelines specify a 'substantial term of imprisonment' for a defendant who committed an offense as part of a pattern of criminal conduct from which the defendant derived <u>a substantial portion of the defendant's income</u>." (emphasis added).

the district court should have *sua sponte* awarded him the additional reduction, even without a Government motion.

To understand Defendant's argument, one must first understand the structure of the Guideline provision governing acceptance of responsibility. Section 3E1.1(a) provides for the decrease of two offense levels when a defendant has clearly demonstrated acceptance of responsibility. The commentary to this section sets out a long list of factors for a court to consider. The most prominent factor is whether the defendant has truthfully admitted the conduct comprising the offense of conviction and has truthfully admitted, and not falsely denied, any additional relevant conduct for which § 1B1.3 would hold him accountable. U.S.S.G. § 3E1.1 cmt. n.1. Typically, a guilty plea will constitute a truthful admission of the defendant's conduct. Once awarded the two-level reduction under § 3E.1.1(a) for having clearly accepted responsibility for his offense, a defendant may qualify for an additional one-level reduction under U.S.S.G. § 3E1.1(b) if the Government so moves and states that the defendant timely notified the Government of his intention to plead guilty, "thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."[9]

---

[9] To receive an additional one-level reduction under § 3E1.1(b), the defendant's offense level prior to any reduction for acceptance of responsibility must be a level 16 or greater. Defendant's offense level here clearly met that requirement.

Here, the district court awarded Defendant a two-level reduction under § 3E1.1(a).  The Government, however, declined to move for an additional one-level reduction under § 3E1.1(b), explaining that it was justified in doing so given Defendant's obstruction of justice prior to his plea of guilty.  Although Defendant now contends on appeal that the district court should have taken it on itself to force the Government to make the motion, Defendant never asked the district court to so act during the sentencing proceeding.  To the contrary, defense counsel's remarks indicated his belief that it was exclusively within the Government's control whether Defendant would receive the additional one-point reduction.  Rather than question the Government's justification for withholding a motion, defense counsel responded that, after accounting for the two-level reduction under § 3E1.1(a) that the court indicated it would award, the final offense level would be 34 "unless the Government wants to give him his other one point for timely pleading."  Moreover, following a discussion that actually established the correct total offense level as a 32, the district court inquired, "Any other objections?"  Defendant made no mention of a possible reduction under § 3E1.1(b), asserting "the only other thing I wanted to point out is that I think his criminal history is overrepresented."  Indeed, at oral argument, Defendant conceded that he did not suggest to the district court that the Government had an improper reason for withholding the motion or that

26

there was a constitutional or any other basis for challenging the Government's decision.

This being so, we review only for plain error Defendant's contention that the district court erred by failing to *sua sponte* declare as impermissible the Government's refusal to move for an additional one-level reduction. *United States v. Waters*, 937 F.3d 1344, 1358–59 (11th Cir. 2019) (a defendant's failure to object on procedural reasonableness grounds at sentencing means that his alleged error will be reviewed for plain error only). Indeed, our sister circuits have applied the same standard of review in similar circumstances. *See United States v. Jordan,* 877 F.3d 391, 393 (8th Cir. 2017) (applying plain error review where on appeal the defendant challenged the Government's refusal to move for a § 3E1.1(b) reduction, but at sentencing, although he had requested the reduction, the defendant "did not ask why the government refused to move for it or argue that the refusal was error. Thus, he did not preserve his objection."); *United States v. Garcia-Carrillo*, 749 F.3d 376, 378 (5th Cir. 2014) (a plain error standard of review applied where defendant at sentencing "failed to apprise the district court of his contention that it was improper for the Government to condition the filing of a motion for a one-level reduction for acceptance of responsibility on an appeal waiver by [defendant]").

27

To determine whether any alleged error by the district court was plain, we must consider the parties' arguments on appeal concerning whether the Government should have been required to file the motion. To evaluate that question, some background on the evolution of this particular Guideline provision is helpful.

### 2.    Legal Background

Prior to 2003, § 3E1.1(b) permitted a district court to award a defendant who had received a two-level reduction for acceptance of responsibility an additional one-level reduction if the defendant had "timely" notified prosecutors of his intention to plead guilty. Absent a determination that the guilty plea was not sufficiently timely, a district court lacked discretion to deny the one-level decrease. *See United States v. McPhee*, 108 F.3d 287, 290 (11th Cir. 1997). In 2003, Congress enacted the PROTECT Act of 2003. Section 401(g) of that Act amended § 3E1.1(b) to require a Government motion before the district court was empowered to award the additional one-level reduction for timely acceptance of responsibility. PROTECT Act of 2003, Pub. L. No. 108-121, 117 Stat. 650 (2003).

After passage of the 2003 amendment, we held that the additional one-level reduction cannot be granted absent a Government motion. In particular, we did not question the Government's motives in withholding a motion when we rejected defendant's argument that he was entitled to an additional one-level reduction

under subsection (b) in *United States v. Wade*, 458 F.3d 1273, 1282 (11th Cir. 2006).  There we stated that "[a] reduction under subsection (b) may be granted only on formal motion by the government at the time of sentencing '[b]ecause the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial.'"  *Id.* (quoting U.S.S.G. § 3E1.1 cmt. n.6).

Some circuits did, however, wrestle with the question whether, following the 2003 amendment, there were limits to the Government's discretion to withhold a motion.  The primary bone of contention concerned whether a defendant's refusal to waive his appeal rights as part of his plea agreement was a valid basis for the Government's refusal.  Nowhere in § 3E1.1 was an agreement to waive appellate rights recognized as a factor in determining acceptance of responsibility.  Some circuits held that the Government could withhold a motion based on interests not identified in § 3E1.1, such as defendant's refusal to waive his right to appeal.  *See, e.g., United States v. Johnson*, 581 F.3d 994, 1002–04 (9th Cir. 2009) (holding that "allocation and expenditure of prosecutorial resources for the purposes of defending an appeal is a rational basis" for a refusal to file a § 3E1.1(b) motion); *United States v. Deberry*, 576 F.3d 708, 711 (7th Cir. 2009) (holding that requiring defendant to sign an appeal waiver would avoid "expense and uncertainty" on appeal); *United States v. Newson*, 515 F.3d 374, 378 (5th Cir. 2008) ("The

defendant's refusal to waive his right to appeal is a proper basis for the Government to decline to make such a motion, as it is rationally related to the purpose of the rule and is not based on an unconstitutional motive.").

Other circuits, however, deemed this to be an illegitimate reason for the Government to withhold a motion. For example, the Fourth Circuit rejected the notion that defendant's refusal to sign an appellate waiver justified the Government withholding a § 3E1.1(b) motion. The court reasoned that "under § 3E1.1(b) the Government retains discretion to refuse to move for an additional one-level reduction, but only on the basis of an interest recognized by the guideline itself— not, as with § 5K1.1 [substantial assistance departure], on the basis of any conceivable legitimate interest"—and that the interest served by § 3E1.1(b) was alleviating the burden of trial preparation. *United States v. Divens*, 650 F.3d 343, 346–48 (4th Cir. 2011) (stating that "the text of §3E1.1(b) reveals a concern for the efficient allocation of *trial* resources, not *appellate* resources") (emphasis in original); *see also United States v. Lee*, 653 F.3d 170, 173–75 (2d Cir. 2011) (adopting reasoning of *Divens* and declaring unlawful the Government's refusal to move for a third-level reduction based on the need to prepare for a hearing to resolve the defendant's objections to the presentence report).

To address this circuit split, the Sentencing Commission amended the Commentary of § 3E1.1 in November 2013. Amendment 775 revised Application

30

Note 6 to restrict the basis on which the Government may justify its withholding of

a motion:

> Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing. *See* section 401(g)(2)(B) of Pub. L. 108–21. **The government should not withhold such a motion based on interests not identified in §3E1.1, such as whether the defendant agrees to waive his or her right to appeal**.

U.S.S.G. § 3E1.1 cmt. n.6 (emphasis added with amended language in bold);

U.S.S.G. app. C amend. 775 (effective Nov. 1, 2013).[10]

"We treat the commentary in the Sentencing Guidelines Manual as

authoritative." *United States v. Searcy*, 418 F.3d 1193, 1195 n.3 (11th Cir. 2005).

Accordingly, Amendment 775 restricts the grounds upon which the Government

may justify withholding a motion to those grounds that serve an interest identified

in § 3E1.1. Albeit setting out different parameters for review, and as explained in

more detail below, circuit courts have concluded that—post-Amendment 775—

judicial review is available to determine whether the Government has improperly

refused to make a § 3E1.1(b) motion. *See, e.g., United States v. Melendez-Rivera*,

782 F.3d 26, 30 & n.3 (1st Cir. 2015) ("[E]ven though the government enjoys wide

discretion in deciding whether to move for this adjustment [§ 3E1.1(b)], the district

---

[10] The Commentary was also amended to make clear that the district court has the final say on whether to grant the one-level reduction even when the Government has filed a motion.

31

court's hands are not tied simply because the government abjures such a motion . . . Amendment 775 makes pellucid that . . . the sentencing court has the authority to review the government's reasons for withholding a section 3E1.1(b) motion."). Moreover, although initially arguing in its brief that our pre-amendment decision in *Wade* forecloses judicial review, the Government conceded during oral argument that judicial review is available for purposes of determining whether the Government's refusal to make a motion was based on interests identified in § 3E1.1(b).

Although our Court has not addressed in a published decision the extent of the Government's discretion to refuse to move for a third-level reduction when the defendant has timely notified the prosecution of his intent to plead guilty, a few other circuits have done so. In *United States v. Brockman*, 924 F.3d 988, 994 (8th Cir. 2019), the defendant complained that the Government had declined to recommend a third point for acceptance of responsibility because he had lodged numerous objections to the PSR and because he had attempted to withdraw his plea. In attempting to interpret the reach of Amendment 775, the Eighth Circuit noted that, per the amendment's commentary, the Government can properly withhold the motion based on any interest identified in § 3E1.1. *Id*. at 994–95. The court concluded that the question "[w]hether a defendant has acted in a manner inconsistent with acceptance of responsibility is clearly an interest

32

identified in § 3E1.1." *Id*. at 995. Further, as the district court acknowledged, the defendant's efforts to withdraw his plea of guilty—and his numerous non-meritorious motions in support of that effort—would have supported the district court's refusal to give even a two-level reduction for acceptance of responsibility under § 3E1.1(a). *Id*. at 994. The Eighth Circuit concurred that the district court had acted generously in even conferring a two-level reduction for acceptance. Accordingly, finding that the Government had a legitimate basis to oppose the awarding of any reduction for acceptance of responsibility, the court held that "[w]hen the government has a legitimate basis for opposing any acceptance-of-responsibility reduction, 'the district court's generous award of a two-level reduction does not compel the government to move for a third.'"[11] *Id.* at 996 (citing *United States v. Gaye*, 902 F.3d 780, 789 (8th Cir. 2018)) (alteration accepted).

*Gaye* bears some similarities to this case. In *Gaye*, prior to pleading guilty, the defendant had attempted to discourage a witness from testifying against him. Accordingly, at sentencing, the district court had enhanced Gaye's sentence by two levels based on his attempted obstruction of justice. 902 F.3d at 788–89. The

---

[11] Given the defendant's efforts to withdraw his plea of guilty, the Eighth Circuit found no reason to reach the question whether the Government could properly withhold a § 3E1.1(b) motion based solely on the defendant's filing of non-meritorious objections to the PSR. *Id*. at 994.

district court awarded Gaye a two-level reduction for acceptance of responsibility under § 3E1.1(a). *Id*. at 789. The Government declined to recommend that an additional level reduction be awarded under § 3E1.1.(b), noting that Gaye should have been given no reduction at all as he had frivolously denied facts alleged in the presentence report and had obstructed justice. *Id*. The district court declined to award this third point, given the lack of an appropriate motion by the Government. *Id*. On appeal, the Eighth Circuit affirmed, observing that the Government offered "legitimate bases for opposing any reduction for acceptance of responsibility . . . and the district court's generous award of a two-level reduction did not compel the government to move for a third." *Id*. It therefore concluded that the district court "committed no clear error in declining to award Gaye a third-level reduction for acceptance of responsibility." *Id*.

The First Circuit addressed the impact of Amendment 775 in *United States v. Rivera-Morales*, 961 F.3d 1 (1st Cir. 2020). There, without objection from the Government, the district court awarded the defendant a two-level reduction for acceptance of responsibility per § 3E1.1(a). *Id*. at 16. As to the potential third point available per § 3E1.1(b), however, the Government refused to make the necessary motion. Its reason: it had been required to "expend appreciable resources" responding to the defendant's suppression motion and preparing for trial. *Id*. As to whether the first reason constituted an interest not identified in

34

§ 3E1.1, the First Circuit declined to "plunge into these muddy waters," but concluded that the need to prepare for trial was clearly a valid reason for the Government's refusal to move for a further reduction under § 3E1.1(b). *Id.* at 16–17.

The Fifth Circuit has dipped its toes into these waters in a few cases. In *United States v. Castillo*, 779 F.3d 318 (5th Cir. 2015), the Government refused to make the § 3E1.1(b) motion necessary for the district court to award an additional one-level reduction based on the defendant's acceptance of responsibility. *Id*. at 320. The Government argued that by contesting the loss amount at issue, the defendant had required the Government "to prove the full scope of her offense in a day-long hearing and evidenced a lack of complete acceptance of responsibility for her offense." *Id.* As noted, Amendment 775 provided that, as to § 3E1.1(b), the Government should not withhold a motion "based on interests not identified in § 3E1.1, such as whether the defendant agrees to waive his or her right to appeal." *Id.* at 323 (quoting U.S.S.G. § 3E1.1 cmt. n.6). Of moment to the present case, the Fifth Circuit addressed the question whether the "interests" in question had to be identified in § 3E1.1(b) or whether, instead, it would suffice if those interests were found anywhere within § 3E1.1. The Fifth Circuit adopted the latter interpretation, noting that the plain text of the Commentary nowhere restricted the interests to § 3E1.1(b) only: "The plain language of the commentary thus allows the

35

government to refuse to file a § 3E1.1(b) motion based on an interest that is identified in § 3E1.1, without regard to which subsection contains the interest. The commentary does not prohibit the government from identifying an interest in § 3E1.1(a) and relying on that interest as a basis to refuse to file a § 3E1.1(b) motion."). *Id*. Thus, the court concluded that the Government "may withhold a § 3E1.1(b) motion based on an interest identified in either subsection (a) or (b) of § 3E1.1." *Id.*

That said, the court rejected the Government's argument that the time expended litigating the extent of the loss resulting from the defendant's theft undermined the "efficient allocation of governmental resources," as set out in § 3E1.1(b). *Id*. at 324. The Fifth Circuit held that the efficient allocation of resources refers to the preparation for trial, not sentencing, noting that Amendment 775 had cited an opinion from the Second Circuit so holding. *Id.* at 324–25. Nevertheless, if, on remand, the district court concluded that the defendant's challenge to the amount of money stolen was not made in good faith, then the Government could properly refuse to move for the additional one-level reduction. *Id*. at 326. On the other hand, if the court determined that the challenge was made in good faith, then the challenge did not constitute a permissible basis for refusing to move for the reduction. *Id*.

36

The interests identified in § 3E1.1(b), alone, relate only to the timeliness of the defendant's notification to the Government of his intention to plead guilty, with a timely notification "permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1(b). Since *Castillo*, the Fifth Circuit has squarely faced a situation in which the Government based its refusal to make a § 3E1.1(b) motion on interests clearly not identified in that subsection. In *United States v. Halverson*, 897 F.3d 645 (5th Cir. 2018), the Government declined to file a motion under § 3E1.1(b) because the defendant, a child pornographer, had failed to cooperate with victims' attorneys regarding restitution and had refused to decrypt his hard drives. *Id*. at 655–56. Concluding that the district court did not err when it refused to force the Government to file the motion, the Fifth Circuit noted that the commentary to § 3E1.1 provides that the voluntary payment of restitution prior to sentencing and the voluntary assistance to authorities in uncovering the instrumentality of the offense are relevant factors in determining whether any credit for acceptance of responsibility should be given. *Id*. at 656. *See* U.S.S.G. §§ 3E1.1 cmt. n.1(C) and cmt. n.1(E). Reasoning that, consistent with the text of Amendment 775, the Government may properly refuse to make a § 3E1.1(b) motion so long as it considers an interest within § 3E1.1—regardless of whether that interest is referenced in § 3E1.1(b)—the Fifth Circuit concluded that the

37

Government was not required to seek an additional one-level reduction for the defendant, given the defendant's refusal to cooperate as to restitution and as to decrypting the hard drive of his computer.[12]  *Id.* at 656–57.

The Fifth Circuit again confronted the question whether the Government could properly decline to file a § 3E1.1(b) motion in *United States v. Silva*, 865 F.3d 238 (5th Cir. 2017).  There, before pleading guilty, the defendant had filed a motion to suppress evidence seized from an allegedly locked compartment—a motion that was denied.  *Id*. at 240, 245.  The Government refused to file the § 3E1.1(b) motion, stating that the "entire basis of and all the allegations contained in the motion to suppress were falsified."  *Id.* at 245 (alteration accepted).  The Fifth Circuit agreed, concluding that the defendant's motion "'forced the government and the district court to allocate resources they would not have been required to allocate' if he had not falsely represented that the compartment was locked, a consideration underlying § 3E1.1."  *Id*. (quoting *United States v. Membrides*, 570 Fed. App'x. 859, 860–61 (11th Cir. 2014) (per curiam).

---

[12]  As noted, the Eight and Fifth Circuits have indicated that the Government may decline to make a § 3E1.1(b) motion based on any interest identified in § 3E1.1, regardless of whether that interest has been identified in § 3E1.1(b).  The Second Circuit has expressed its disagreement with that principle at least insofar as it is the district court declining to award the third-point reduction once the Government has made the motion.  *See United States v. Vargas*, 961 F.3d 566, 580–84 (2d Cir. 2020) (reversing a district court's refusal to award the third point under § 3E1.1(b), even though the Government had made the proper motion, where the district court concluded that lengthy proceedings necessitated by the defendant's suppression motion had undermined the Government's ability to allocate its resources efficiently).

Finally, in *United States v. Longoria*, 958 F.3d 372 (5th Cir. 2020), the Fifth Circuit once again addressed a case in which the Government refused to recommend that the defendant receive the third-point reduction for acceptance of responsibility because the defendant put the Government to the burden of a suppression hearing. *Id*. at 374. In *Longoria*, there was no contention that the defendant's suppression motion was falsified or frivolous. Further, the Fifth Circuit noted that "if [it] were writing on a blank slate, Longoria might have a compelling argument," as § 3E1.1(b) "speaks of 'trial,' not pretrial hearings, and preparing for a suppression hearing usually requires less time and resources than trial preparation." *Id*. at 376. Indeed, the court noted, even prior to Amendment 775, three circuits had agreed with the defendant's position. *Id*. Nevertheless, the court's pre-Amendment 775 precedent recognized that by requesting a suppression hearing, a defendant required the Government to expend resources, which need could properly justify the Government's refusal to move the district court to give the defendant a third point for acceptance of responsibility. *Id*. at 376–77. That being so, this "entrenched caselaw" was binding, absent an intervening change in the law. *Id*. at 377. And, the court concluded, Amendment 775, although authoritative, did not clearly overrule its prior precedent. *Id*. at 377–78. Specifically, the amendment purported to address the impropriety of withholding the third point when the defendant has refused to sign an appeal waiver. *Id*. at 378.

39

"[I]t tellingly does not directly address the circuit split that has long existed on whether the government's having to go through a suppression hearing is a valid basis for not requesting the third point.  That silence suggests that the Commission, which keeps track of splits on Guidelines issues, chose not to clarify section 3E1.1 in the suppression context."  *Id.*  Further, the suppression hearing in the case came close to being the substantive equivalent of a full trial, so that once it was denied, the game was pretty much over for the defendant.  *Id.* at 378–79.  Thus, the defendant's insistence on such a hearing was comparable to an insistence on a trial.  Accordingly, the court held that the Government "did not rely on an impermissible interest in withholding the third point for acceptance of responsibility."  *Id.* at 379.

### 3.    The Take-Away From The Caselaw

The take-away from related case authority is inconclusive.  As to the breadth of a timeliness assessment, the circuits are not uniform as to whether the defendant's insistence on a suppression hearing can justify the Government's refusal to make a § 3E1.1(b) motion.  As the argument in support of that proposition goes, a defendant who has prompted such proceedings, instead of admitting his guilt upfront, has undermined the Government's ability to allocate efficiently its resources in a proceeding that will often mimic the preparation necessary for a full-blown trial.  The argument against allowing the Government to resist a § 3E1.1(b) motion on this ground is that the text of § 3E1.1(b) speaks of a

40

timely notification of an intention to plead guilty as "permitting the government to avoid preparing for trial."

The issue underlying the Government's refusal here to file the motion—Defendant's obstruction of justice—did not cause the Government additional work, as would the filing of a suppression motion. Nor was untimeliness in any way implicated by the Defendant's conduct. Thus, the question becomes whether the Government can decline to make a § 3E1.1(b) motion only when a defendant has been untimely in providing his notification of a guilty plea—or whether, instead, the Government may refuse to file the motion if the defendant has engaged in conduct that is itself inconsistent with § 3E1.1(a), such as filing frivolous objections to sentencing enhancements recommended by the PSR, not being fully cooperative in terms of restitution obligations, or—as here—engaging in obstructive conduct.

Obstructive conduct is a factor to consider in determining whether to award a defendant a two-level reduction for acceptance of responsibility under § 3E1.1(a). "Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." § 3E1.1 cmt. n.4. The argument in favor of the Government's refusal to

file a § 3E1.1(b) motion when the defendant has obstructed justice is the language

in Amendment 775 that the Government "should not withhold such a motion based

on interests not identified in § 3E1.1." Obstruction of justice clearly involves

interests identified in § 3E1.1. The argument against allowing the Government to

refuse to file the motion is that such an action takes us far afield from the focus of

§ 3E1.1(b), which looks to the timeliness of a defendant's notification to the

Government that he will be pleading guilty and which notification allows the

Government to cease the unnecessary expenditure of its resources.

In short, in the case of a timely notification of a decision to plead guilty, it is

clear that the Government can no longer base its refusal to move for a third-level

reduction on a defendant's refusal to waive appellate rights. Beyond that, nothing

else is clear as a review of out-of-circuit cases suggests no consensus on what other

grounds can justify the Government's refusal to make a § 3E1.1(b) motion.

Moreover, here we are examining the question whether the district court plainly

erred when it failed to *sua sponte* award Defendant a third-level reduction. "An

error is plain if it is 'clear' or 'obvious'—that is, if 'the explicit language of a

statute or rule' or 'precedent from the Supreme Court or this Court directly

resolves' the issue." *United States v. Innocent*, 977 F.3d 1077, 1081 (11th Cir.

2020) (citations omitted) (alteration accepted). The language of § 3E1.1, as

amended by Amendment 775, does not explicitly address whether the Government

42

can properly refuse to file a § 3E1.1(b) motion based on the defendant's obstruction of justice prior to his plea of guilty. Likewise, there is no precedent from this Court or the Supreme Court doing so. Given that Application Note 6 arguably affords the Government latitude to withhold a motion based on interests identified in § 3E1.1—and Application Note 4 expressly references obstruction of justice as a factor impacting the analysis of acceptance of responsibility under § 3E1.1(a)—the district court did not plainly error by failing to *sua sponte* require the Government to move for the additional one-level reduction, notwithstanding Defendant's obstruction of justice. Having found no plain error, we therefore affirm the district court's denial of an additional one-level reduction under § 3E1.1(b).

### E.     The District Court Did Not Impose a Substantively Unreasonable Sentence

Defendant challenges his concurrent 151-month sentences as being substantively unreasonable. We review the reasonableness of a sentence under a deferential abuse-of-discretion standard. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). Defendant bears the burden of demonstrating that "the sentence is unreasonable in light of the entire record, the [18 U.S.C.] § 3553(a) factors, and the substantial deference afforded [to] sentencing courts." *Id*. at 1256.

43

After reviewing the record and the § 3553(a) factors, we conclude that the district court's imposition of concurrent 151-month sentences was substantively reasonable. The district court selected a sentence that is well below the statutory maximum of life[13] and at the very bottom of the guideline range (151–188 months), which was already adjusted downward from 188 to 235 months following the district court's determination that Defendant's Criminal History Category of V overrepresented his criminal past. *See United States v. Croteau*, 819 F.3d 1293, 1310 (11th Cir. 2016) (holding the sentence was reasonable in part because it was within the guidelines range and well below the statutory maximum ); *United States v. Carpenter*, 803 F.3d 1224, 1234 (11th Cir. 2015) (considering a sentence being "at the very bottom" of the guideline range a factor indicating reasonableness). Far from an abuse of discretion, the court's imposition of a 151-month sentence reflects a considered judgment that properly accounts for the seriousness of Defendant's criminal conduct, his past criminal actions, and the need to protect the public from further crimes of the Defendant. 18 U.S.C. § 3553(a).

Nevertheless, Defendant argues that his sentence should be deemed substantively unreasonable because of the disparity between his sentence and the sentences of other co-conspirators. We must consider the need to avoid

---

[13] Defendant's maximum sentence for Count 1 was a life sentence due to the filing of an 18 U.S.C. § 851 enhancement.

44

unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). Defendant bears the burden of showing that an unwarranted sentencing disparity renders his sentence substantively unreasonable. *United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015). And "there can be no 'unwarranted' sentencing disparities among codefendants who are not similarly situated." *Id*.

Defendant asserts "[t]he disparity in sentences in this case is outrageous," noting that Brett Brownell received a 70-month sentence, Remeyer a 72-month sentence, and Sindylek a 90-month sentence. But none of those co-conspirators were similarly situated. Brownell had only a Criminal History Category of I, whereas Defendant had a Criminal History Category of V, which the district court downwardly departed to reduce to a Category III. Moreover, Brownell was not subject to an § 851 enhancement that increased Defendant's statutory minimum from five to ten years and his maximum from 40 years to life imprisonment. Nor was Brownell found to have obstructed justice. Thus, Defendant is not similarly situated to Brownell.

Likewise, Defendant is not similarly situated to Remeyer and Sindylek. Both provided substantial assistance to the Government and received a substantial downward departure under U.S.S.G. § 5K1.1. And, like Brownell, neither were subject to an § 851 enhancement or an obstruction of justice enhancement.

"It is not enough for [Defendant] to simply compare the sentences of other defendants in the conspiracy to his own; there must be comparable underlying factual circumstances." *Id*. Defendant has not carried his burden to show specific facts establishing that any codefendants are similarly situated. Accordingly, we find Defendant's sentencing disparity arguments unpersuasive and we affirm the district court's imposition of concurrent 151-month sentences as substantively reasonable.

## III.   CONCLUSION

After careful review, we affirm the sentence imposed by the district court for the reasons explained above. **AFFIRMED.**